This case, Topgolf, intended to preserve the company's monopoly of golf entertainment centers in its offshoots through practices that exclude or severely hinder rivals and do not benefit consumers. With a market share of virtually the whole market, Topgolf's efforts violate traditional antitrust principles. This is, and I'm quoting from Doctors Hospital, Judge Stewart, this is not one of those strange cases that I'm going to go into withstanding becomes a real issue. There are no efficiencies and consequently Topgolf's conduct, the acquisition of that protracer, is anti-competitive. Now the court, the district court in this case, dismissed the case on the pleadings. There were no discovery. This was not a long time court. The case did not sit there. The district court did not allow discovery. And the court's opinion really is short. His ruling, Judge Miller's ruling, is based on basically two points, antitrust standing and Article III standing. The key aspect of his ruling that I think is error, I think there are several, but I think the easiest one that compels reversal is his conclusion, his factual conclusion that, and this is record, in his opinion, record 179, the court, he says, is unpersuaded that the lack of assurances in the statement to look for alternatives that was allegedly made by an unidentified Topgolf executive is equivalent to a denial of access. And I will elaborate further on that, but the point is the district court gravely erred by making a factual determination based on credibility. That's what my brief says. I should also add to that, it's not a new point, that really what he did was he made a factual determination that became a legal determination. And as the court, the Supreme Court said in Johnson v. City of Shelby, in a procurium opinion, a plaintiff, the court said, must plead facts sufficient to show that her claim has substantive plausibility, not legal. And what the district court in this case did, made a factual determination, and the legal implication of those facts, that conclusion, became the bedrock of his Article III standing and his antitrust standing. I think that fact alone, that conclusion. But it wasn't his fact, it was looking at your allegations. Correct, Your Honor. But did you or did you not allege that Topgolf breached the license agreement? No, we have not. Did you or did you not allege that they refused to extend it? We did. I thought you just said they didn't assure you that they would extend it. What we did is we met with them and we sought assurances that now that the dominant player And they wouldn't give assurance. And they wouldn't give assurance, but they went further. They went further, Your Honor. Not only did they not give assurances, they could have given assurances. And I'll elaborate on this further because I think it's a very relevant point. But they went further and said, if we were you, we'd look for alternatives too. Even though in the pleadings, which must be accepted as true, say, even quoting Topgolf, that there are no alternatives. They themselves say this is the only technology that can support this kind of business, this model that SureShot wanted to. But you went to Protracer. You sought them out. That's correct. You could have urged somebody else to develop the technology. Protracer's technology is patented technology. There is no alternative, Your Honor. That's the allegation which must be accepted as true. But even accepting that allegation, you were the one that sought just a five-year license with no guaranteed renewal. That is correct. All right, so let me get to the elephant in the room, this option contract, this notion. And this is their big argument that the district court, I think, bought into. Let me step back and say that – and I addressed this briefly in our brief. Antitrust law cannot be vitiated by contract law. And let me elaborate further on that. It would be no different than if I have a supplier agreement and I have a five-year supplier agreement and I find out during year two that the supplier, my supplier, is in a price-fixing conspiracy with supplier number two. There would be no defense. They would have no defense to say, look, you should have signed a five-year contract. In fact, three years ago this court affirmed a jury verdict in a group boycott, Your Honor, in fact. In that case, the supplier had a 30-day termination clause. No one would argue that they can come and invoke that clause to render moot Section 4 of the Clayton Act. And the point I'm making, Your Honor, is – and this goes really to price-fixing. It goes to minimum price – setting minimum prices, maximum prices, anything. Covenants have to compete. Antitrust law cannot be rendered toothless because there is an option. But the steel case was collusion. Here you don't dispute. Protracer just got bought out. I mean they gave you neutral promises, but then they were bought out by Topgolf. That's right. It seems completely dissimilar to the steel case. So I agree. The cases you relied on were the skiing case and the newspaper case. That's right. But those cases it was a complete refusal to deal, whereas here you're anticipating they may not deal with you. All right. So the answer to that question, Your Honor, is twofold. One, Section 4 is very broad. Brunswick itself says it. McCready says it. That I don't need to even be totally blackballed out of the market. Any harm, any harm. And the harm has happened. I have already closed. Why would I ever do business when I know that the dominant player now has the only technology that I need to compete? One. Two, and this same argument, exactly argument, and McCready, 1982. McCready is the case where the insurer sued the insurance company because they wouldn't reimburse her for seeing a psychologist as opposed to a psychiatrist. And then McCready, and this is footnote 16 and 17 of McCready and the accompanying text, Your Honor. In McCready, the Supreme Court rejected the very same arguments of contract law because what the insurance company said, Blue Shield said, is look, she's got a contract. Her employer has a contract. And I might add, footnote 16 of that case says, the defendant said the employer has an option to terminate the contract. They can terminate it and come back and renegotiate. The Supreme Court said no. The harm is the – and to bring it back to our case, the harm was the predatory intent of Topgolf to take its monopoly profits to purchase a supplier, protracer, who had avowed neutrality. And now we are in a market of one. No one else is going to be able to compete with Topgolf. They themselves say – remember this is on the pleadings. They may have justification, business justification to follow the three burden shifting of the rule of reason if this is a rule of reason case. But that is not – today is not the day to address whether they have a business justification or not. The allegation is that they had a very good business, making tons of money, and when they saw the new technology, they bought that technology. What that does – and we're not here to discuss the merits because the district court avoided all discussion of antitrust law on the merits. But really what we are going to end up with is a take-all economy where the monopolist will be able to scoop up all new technology and no one else will be able to get into it, especially in industries like this one where you have IP, strong IP, and other forces that prevent industry – new companies to enter the business. So I think the district court's error in making a determination about credibility or just giving weight to that decision as opposed to just accepting it as true that you have alleged facts. Those facts are sufficient to show antitrust injury. Incidentally, the district court talks about Article III standing. Under Associate General Contractors 1983, United States Supreme Court – McCready's 82 if I may have made a mistake earlier. From Associate General Contractors footnote 31 and the accompanying text, antitrust injury is sufficient to satisfy Article III standing so that there really was no reason to delve into the Article III standing issue. Well, how have you been injured now when at most it could happen three years down the line? What about ripeness? Your Honor, we believe right – so the Supreme Court has said that Section 4 of the Clayback, which is the statute that says injury in any business in any form. It doesn't have to be total. You don't have to go out of business to file an antitrust lawsuit. And, in fact, in the classic cases of, for example, acid and skiing and numerous others, the plaintiff is not totally out of the market. He has been – he or it has been injured in some other minor way. In our case, we've gone out of business, Your Honor. We – Well, you opted to go out of business. We did not opt – Your Honor, to quote or to borrow from McCready, this is the insurance case. To quote Justice Brennan's opinion, it says you've given them – given her a Hobson's choice. She can either not go see a psychologist, see a psychiatrist because of your conspiracy – you conspired with the psychiatrist – or pay out of pocket. That's like us. So in five years, we – and these facilities, Your Honor, are not inexpensive. Each facility may cost $20 million to $30 million to build, and we're not even talking about the initial expense. So that basically they would ask us to spend five years spending hundreds of millions of dollars with no guarantee that they would ever – that they would ever assure us that the technology was available to us. But, of course, this is a pleading stage case, and all facts must be accepted as true. They have already told us, one, that if they were us, they would look elsewhere. I think that has to be accepted as true. The implication of that fact is we are not going to share this technology. Two, that same press release cited in the complaint – and there's a link to the actual press release that the court wanted to see at ROA 18 – says Topgolf will continue to license the technology to driving ranges. It has already told us, and those facts must be accepted as true, that it intends to keep the technology only for itself in the golf entertainment center business and that it might release it to golf ranges. So we know that is – I think accepting the facts is true. And, of course, without discovery, I think the facts are accepted as true, which is the proper standard. We should get to discovery. My sense is, having been an antitrust lawyer for a few years, there are going to be emails and there are memorandums that say when we buy Protracer, we are not going to spend this exorbitant amount of money to buy these patents and share them with our competitors. I don't think it's far-fetched to infer that, and that's really what happened in this case. Now, the couple of things that I wanted to get to are Brunswick, because this notion that it's really inapplicable, Jabacco also, this notion that somebody else could have bought the business, another distributor, another company. This is really – candidly, this argument has really taken out of control because, one, there is nobody else. This is an industry of one. There are no factual statements or alternatives that somebody else could come scoop this up, one. Two, unlike Jabacco or Brunswick, this was not a failing business or somebody that was auctioned off, unlike Jabacco or Brunswick, for example, which was in bankruptcy. In other words, this was not a failing business. In fact, the opposite. Protracer said we're thriving and we want to stay neutral. And ultimately, the real question – because some of these cases, any of those cases, can have a problem that principles are applied to very generally, both Brunswick and Jabacco. That's from this court versus Harris. The key factor to remember is that in those cases, the acquisition results in more competition. It is undisputed at this pleading stage that Protracer's – Topgolf's acquisition of Protracer and its patent portfolio results in less competition. So I think this notion that the district court relied on – and candidly, those are merger cases. Those are odd cases. Those are atypical cases, as Doctors Hospital – as Judge Jones wrote in Doctors Hospital. This is a merits – we have alleged a classic antitrust case. And without discovery, the court should not have ruled on the pleadings. Even in Doctors Hospital, the court says this notion of harm to competition, for example, that is not an inquiry that should be decided early on. That should be decided after merits discovery. The real gist of the Doctors Hospital is that only in very atypical cases like Jabacco, where you had somebody who was not even in the industry at all seeking antitrust relief, or for that matter, the union case, the associate general contractors where the Supreme Court held there was no causation. None of those factors are evident in this case. All right. Thank you. All right. Ms. Johnson. Thank you, Your Honor. May it please the Court. SureShot asserts an antitrust claim that is premised on a unilateral refusal to deal when there has never been any refusal to deal. To the contrary, SureShot alleges in its complaint that it currently has a five-year license from Protracer to use the technology that it alleges that it needs. It negotiated that five-year term with Protracer before Topgolf ever purchased Protracer or had anything to do with it. SureShot does not allege that Topgolf has interfered with that license in any way. And he even said today that he is not alleging any breach of that contract. All that he is alleging is that there is a possibility that two years from now, in 2020, when the contract expires, if SureShot chooses at that point to seek a license, Topgolf has declined to assure it that it will renew the license at that point. If at that point SureShot does seek a license and Topgolf does refuse that license, SureShot could bring an antitrust case. He would still lack antitrust injury, but there would at least be a refusal to deal to challenge. Until that point, there is no refusal to deal to challenge, and therefore there can be no refusal to deal antitrust claim. It just still strikes me odd for a case like this to dive out on 12B6. I'm not saying it's not correct yet, but it just struck me when I started reading it. It just seemed odd, odd in the sense that we get so many cases that are so far off the map and that you see why the 12B6 comes. It's there. On the other hand, it is somewhat disfavored. We get our share of cases that go out on summary judgment, but at least then there's something. The appeal is from the judgment, not the reason. We get all twixted up looking at what the judge said versus what is the judgment. They're tossed out on a pleading. In mixing that, the Iqbal standards apply to every case, but then you get this specific law in the antitrust arena that just, to me, makes it a much more complex focus on tossing out a plaintiff in what facially just doesn't look totally sort of worthless over here. So it does worry me. I'm not saying I've made my mind up at all about it, but just initially it just seemed premature, or particularly if the pushback, as you just gave, is kind of based on what the contract says and what may happen when he seems to be asserting, well, contract, yes, but straight up antitrust violation, blah, blah, blah, yet to be proved. Anyway, I'm just sort of voicing, because it's here on 12B6, as opposed to merits or summary judgment, extruing facts, what is said in depositions, and all of that. So the question buried beneath that is to say, I know what you just said about what they're alleged and whatever, but it's the question you've heard us ask all day. Where does this case fit in a 12B6 antitrust stand? What's the best case, the most helpful case to us that, despite what I just kind of said, this fits right here, antitrust or not, out the door? I think, Your Honor, there are several. I think that, of course, Twombly itself was an antitrust case, and the court acknowledged in Twombly that the allegations there simply were too conclusory. Of course, that was a 12B6 case. I believe also Verizon v. Trinco, the Supreme Court's decision in that case, that was also a motion-to-dismiss-stage case. And in that case, the plaintiff, like Shershot here, attempted to make an Aspen skiing refusal-to-deal argument. And the court even, and of course here, you don't reach the Aspen skiing question, because you can dismiss a right, but you can dismiss an antitrust injury. But even having to delve into the actual antitrust allegations in Trinco, the court found that they were inadequate, because taken as true, they wouldn't actually establish an antitrust violation under Aspen skiing in the rain journal. I think as far as ripeness goes, you step back to the first stage of assuring the court of its jurisdiction, and what I think should reassure the court at the 12B6 stage is that the court, the district court, did take every allegation made in the complaint fully as true. And the allegation that Topgolf said, and Shershot literally put in quotes what he alleges that Topgolf said, and that allegation the district court took entirely as true, that Topgolf had in fact said, we will not guarantee you an extension now, and if I were you, I would look for alternatives. And the fact that even assuming that was entirely true, it still would not involve any refusal to deal, means that the case is appropriate for dismissal at the 12B6 stage. And if he, again, it doesn't mean that his antitrust claim, if he ever has one, if there's actually a refusal to deal, couldn't someday be dealt with. But it does mean that right here, just based on the facts as he has alleged them, there's nothing for discovery to show. If discovery shows the emails that Shershot is referencing, none of that would have any bearing on the fact that this is still a refusal to deal case in which Shershot alleges in its complaint and concedes when it stands here it has not been denied anything and no one has refused to deal with it. The other point that was made several times in the argument that I wanted to make sure and reference or discuss is the allegation that there is just no alternative to this technology and therefore that there's no way that Shershot can compete without it. The complaint does also allege that Topgolf is a monopolist and that Topgolf does not use this technology because Topgolf only recently acquired it. And so there clearly, it's from the complaint, it's clear that there are other technologies, and Shershot doesn't allege any monopoly that Topgolf has in a market for technology. He's focused exclusively on a market for golf entertainment centers and does not allege a monopoly in the technology market. To go back to your ripeness question, because I remembered another case I should have told you, which is Clapper. And I think it's very important to look at Clapper versus Amnesty International, the Supreme Court's 2013 decision when you're evaluating ripeness. Because in Clapper, the Second Circuit had considered, and Clapper I don't believe is a motion to dismiss stage case, so I don't want to mislead you on that. But Clapper was, the Second Circuit had applied a test of whether there was an objectively reasonable likelihood that the plaintiff would suffer the injury that the plaintiff feared, which was that conversations the plaintiff desired to have with foreign nationals might be monitored by the federal government. And when the Supreme Court reversed, it concluded that even an objectively reasonable likelihood that you will suffer the harm that you are challenging is not enough to give rise to Article III jurisdiction. Instead, it applied the more traditional test of whether the injury is certainly impending. And the plaintiffs in that case, very akin to Shershot here, alleged that not only was the injury certainly impending, but that they had already suffered an injury, because in order to try to avoid the monitoring that they feared, they had undertaken expense to protect themselves to prevent that monitoring. And the court said that even if those steps were reasonable, and even if expense was incurred because of those steps, that still does not confer ripeness. It does not make for a ripe dispute, because it does not make for a certainly impending injury, because the plaintiff cannot unilaterally inflict injury on itself, even reasonably so, even as a reasonable reaction, simply because it fears an injury that is not certainly impending. Would the issue of ripeness be different if the facts were that instead of saying, if I were you, I'd look somewhere else, the officer had said, we will not renew this when it expires? I think that the question of ripeness would be harder then, because there would actually be a clear allegation of future intent. But it still would not be a ripe dispute because of the fact that it wouldn't be a certainly impending injury. Many things could change in three years. SureShot could decide it no longer wanted the technology, so the refusal could never happen. SureShot could fail as a company and decide not to spend the money on the technology. Another technology could enter the market, and SureShot could decide that it wanted that technology at that point. So part of ripeness is the clapper question of whether there's been an injury or the injury is certainly impending. But part of it is also more where this court was focused in Middle South, which is are we prematurely entangling ourselves in something that isn't a real controversy, prematurely before we have to do it, because it may never come up. And so in Middle South, the question was the city started thinking it might want to exercise an option it had to purchase NOPC. And as it's thinking about whether to do that, it does a study on the viability of it, and it looks into kind of taking the preparatory steps to buy it. And so the plaintiff sues for a declaration that that can't be done, that the option would violate the law, exercising the option would violate the law. And the court said effectively, you know, when and if that happens will be the time for us to evaluate that issue. And I think the same is true here. So even if there were a clearer, more categorical statement, which there isn't, you would still have the situation that it hasn't actually happened yet. And so given that it hasn't happened yet, this court is reaching out for a controversy that isn't present. In Middle South, I mean, the city was always going to continue, right? And here isn't the allegation we can't continue our business. Not only do we shut down, we couldn't even open. There's an implausibility if you've got to wait a bunch more years where you have no income stream because you can't open by virtue of this predatory behavior. Isn't that their theory of imminent harm? I'm not sure because nothing about the fact that they don't have guaranteed access in three years should prevent them from opening now. And I don't take them to be alleging that because he even said this morning it just wouldn't make sense for us to open now if somewhere down the road we may lose access. So I think it's different than saying that anything that Topgolf has done has actually forced them to close or forced them not to open. Because, again, right now they have the technology, so they could open with it tomorrow and just have chosen not to do so. I do think that in addition, obviously, ripeness is the first threshold question because it is an Article III standing question. But the antitrust standing holding that the court reached is also an independent reason, an independent basis to support the court's judgment. And with respect to that argument, the antitrust injury argument, I think both the Supreme Court's decision in Brunswick and this court's decision in the Jebico case are right on point because the focus in those type of antitrust injury cases is whether the injury that was suffered, if there was an injury, is of the type that is the reason the conduct is unlawful. And so what Shershot alleges here is that Topgolf has a market, a monopoly in a market for golf entertainment centers. And the reason that having a monopoly or furthering a monopoly in a market for golf entertainment centers, if that were a viable antitrust market, the reason that would violate the antitrust laws is not because if you have that, competitors might be denied access to technology in a different market. The reason that a monopoly would be—well, excuse me. So the point in Brunswick, what the court held in Brunswick was if the acquisition here was unlawful, it was because the purchaser, which came and bought Bowling Alleys, brought a deep pocket parent into a market of small companies. And then the court held respondent's injury, the loss of income that would have accrued had the acquired centers gone bankrupt, bears no relationship to the size of either the acquiring company or its competitors. I think the same thing is true here. If Topgolf has monopolized or attempted to monopolize, as Shershot had claimed, it is because Topgolf has, he alleges, the entire share of the golf entertainment center market. But Shershot's claimed injury, that it can't open because it doesn't have long-term access to Protracer, has nothing to do with how big a share of the market for golf entertainment centers Topgolf has. And so, for example, if David Busters, who, as far as I know, is not currently a participant in a golf entertainment market, if David Busters had decided to enter that market and bought Protracer to do so and then decided not to license it to other competitors so that it would have a differentiating factor, Shershot's injury would be identical. It would be the exact same injury because there's nothing significant about the fact or the allegation that Topgolf has a monopoly. It doesn't have any role to play in his injury. His claimed injury is the lack of access to technology that's in another market from the claimed monopoly. And so Jevico, this court's decision in Jevico v. Harrah's, is really exactly the same. Again, Jevico was getting, it didn't have a property right, but it had a right to receive money from certain casinos. Those casinos were sold, along with the accompanying gambling license, and the buyer transitioned those licenses to other casinos in which Jevico didn't have an interest. So Jevico sued. And this court reasoned that if a different firm had purchased those assets other than the supposed monopolist, it too might have chosen not to operate at Jevico's preferred berths, the locations where Jevico got money. No antitrust violation would have occurred because the monopolist wouldn't have been involved, but Jevico would have suffered the same injury. And again, I think the same thing is true here. There would have been no monopolization theory if a Dave & Buster's had purchased Protracer. But the claimed injury, to the extent that you think of future refusal to deal as an injury, that same injury would have been suffered by SureShot in exactly the same way and to exactly the same extent. If the Court has nothing further, we'll reserve the rest of the time. Okay. Thank you very much. Back up to you, Counsel, for rebuttal. There are several points, and McCready, the same thing could have happened. Ms. Carol McCready could have just finished her contract or let the employer finish their contract and then sued. The Court didn't buy that. The Court said, you've suffered the injury today. We have suffered the injury today. Incidentally, as an aside, if we sued in three years, we'd have statute of limitations problems. So the issue is, have we suffered a harm under Section 4 today when this happened? It did. This is a monopoly case and an attempted monopoly case. Their acquisition is to further a monopoly. That harm has happened. Indeed, it's conceivable under Section 4 that consumers could sue them. If consumers could sue them, surely a competitor who has been bought out based on the facts, allegations in this case that they have told us, Your Honor, that basically go and find it somewhere else, one. And two, the record indicates that they've said they're only going to sell it, only market it, license it to golf ranges. Your Honor, Chief Judge Stewart, you mentioned 12B6. It is correct. This case should not be dismissed on 12B6, the Trinco case. And let me just read one thing from Trinco because I think it's extremely important. Justice Scalia, candidly no big fan of antitrust enforcement, private antitrust enforcement, said antitrust analysis must always be attendant to the particular structural circumstances of the industry at issue. If Dave & Buster's, to use their example, came and bought Protracer, we wouldn't have a case because Dave & Buster's is not a monopolist in the golf entertainment business. They are. They are already in that market and they have 100%. As Justice Scalia again said in dissent on this issue, on the issue of monopoly, he had no problems in the Kodak case. He said when a monopolist takes action, a monopolist, we look at it in a totally different way. This is not Jabocco. This is not Brunswick where Brunswick had 2% of the market. This is not Jabocco where there's Harrah's and Pinnacle. That's a key issue that when a monopolist takes action, we look at it in a different way. This is not a refusal to deal case. The district court never went into the merits, and I commend him for that because I think we have to have discovery. But this is not a refusal case. This is a classic monopoly case. McCready, I think, is on point on many of the issues. They're trying to give us a false choice just like Blue Cross and Blue Sheet gave Ms. McCready a false choice. This lost choice that I don't think there's much more to say about Brunswick and Jabocco's analysis. They don't apply to this case. Those are atypical cases involving really causation and parties who are not even necessarily, at least in Jabocco's case, competitors. You really cannot overlay that on our case. I do think the district court did make findings of fact. I think he took that statement. As Your Honor said, the judge made interpretations of factual statements, and he should not have, and then he overlaid it on their legal issue. Let me end, Your Honor, with one important point. This case – unfortunately, there have been a number of interesting or atypical plaintiff's cases in antitrust. This case is really about the heart and soul of the Sherman. It is about a monopolist and an attempted monopolist. If we can't get off the ground in this case, then no case, I don't think, will be able to vindicate what Justice Marshall said is the Magna Carta of our free enterprise system. If we cannot get a discovery, that will show. I have no doubt in my mind after being a lawyer for nearly 20 years and practicing antitrust law that there are going to be plenty of discovery that shows that they intended to take this product, that they weren't using because they wanted to foreclose competition, and they have foreclosed competition because we are out of the business, and I don't think there will be discovery that anyone else is in the business. The record shows Callaway Golf, for example, is one of their owners. They are going to – it's going to be insurmountable. The market and this market with IP protection and externalities that are very hard to overcome, and also this is a case where consumers – the differentiation is not going to be tremendous. Without access to that technology, no one will be able to challenge them, and they will reap monopoly profits, which was their intent, and they will do so for the foreseeable future. It may take 17 years or whenever the patent expires or somebody else, but this is classic, as Judge Posner has repeatedly said. This is to sacrifice short-term profits for long-term gain. Thank you, Your Honor. All right. Thank you, counsel, both sides. Robust briefing and argument in the case. It's tough, but it will be submitted and we'll give it our best effort. Thank you.